Filed 6/18/26  P. v. Lopez CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>FRANCISCO PAUL LOPEZ,<br><br>Defendant and Appellant. | F087526<br><br>(Super. Ct. No. BF192791A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Bulldog Law, Mario Tafur and Joshua J. Schroeder for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christopher J. Rench and Jessica Trieu-Simerly, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Appellant Francisco Paul Lopez was convicted by jury of attempted murder of M.P. (Pen. Code,[1] §§ 664/187, subd. (a), count 1); inflicting corporal injury on a dating partner (§ 273.5, subd. (a), count 3); felon in possession of a firearm (§ 29800, subd. (a)(1), count 6); and assault with a semi-automatic firearm (§ 245, subd. (a)(2), count 8). In addition, the jury found true firearm use enhancements (§§ 12022.5, subd. (a), 12022.53, subds. (c) & (d)), and enhancements for the personal infliction of great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)). The trial court imposed a sentence of 25 years to life plus 11 years.

Lopez raises the following claims on appeal: (1) there is insufficient evidence to support his convictions; (2) the trial court erred by instructing the jury with CALCRIM No. 225 instead of CALCRIM No. 224; (3) the court erred by instructing the jury on CALCRIM No. 332 without giving a bracketed portion of the instruction pertaining to hypothetical questions posed to expert witnesses; (4) the trial court was required to instruct the jury with CALCRIM No. 875, which outlines the elements for assault with a semi-automatic firearm, Lopez's conviction on count 8; (5) the court erred by discussing Lopez's immigration status in open court and without conducting an in-camera hearing (see Evid. Code, § 351.4); (6) the court improperly allowed a witness to describe and demonstrate how Lopez fired the gun; (7) the court abused its discretion by declaring A.P. a hostile witness; (8) the court erred in allowing the prosecutor to elicit testimony from an officer about firearms; (9) the court erroneously admitted body worn camera evidence, Facebook video evidence, and related transcripts; (10) the court erred in allowing the prosecutor to replay Facebook Live video evidence during Officer Braughton's direct testimony; (11) the trial court allowed the prosecutor to vouch for the

---

[1] All further undefined statutory citations are to the Penal Code unless otherwise indicated.

credibility of facts and one of the trial witnesses; (12) the court permitted the jury to ask the witnesses questions; (13) the trial court failed to review the adequacy of the prosecutor's case, sua sponte, to determine the sufficiency of the evidence; (14) Lopez's constitutional rights were violated, including, his right to the presumption of innocence, to confront witnesses, to an adversarial process, and his right to a fair trial; and the court committed "Hobbesian error"; (15) the prosecutor committed multiple instances of misconduct, including discussing Lopez's immigration status outside of an in-camera hearing, vouching for the credibility of facts and one of the trial witnesses, failing to prevent instructional error, and failing to dismiss count 3 and the domestic violence enhancements (§ 12022.7, subd. (e)); (16) trial counsel committed ineffective assistance of counsel; and (17) the judicial officer who presided over his case, and the judicial officer who declined to modify a pretrial restraining order protecting M.P. from contact with Lopez, were biased against him. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

On October 18, 2023, the Kern County District Attorney filed an amended information charging Lopez with attempted murder (§§ 664/187, subd. (a); count 1); assault with a semi-automatic firearm (§ 245, subd. (b); count 2); inflicting corporal injury on a dating partner (§ 273.5, subd. (a); count 3); carrying a concealed firearm in a vehicle without being the registered owner (§ 25400, subd. (c)(4); count 4); carrying a loaded firearm in public without being the registered owner (§ 25850, subd. (c)(6); count 5); felon in possession of a firearm (§ 29800, subd. (a)(1); count 6); carrying a concealed firearm (§ 25400, subd. (a)(2); count 7); and assault with a firearm (§ 245, subd. (a)(2); count 8). As to count 1, the information further alleged that Lopez personally and intentionally discharged a firearm causing great bodily injury (§ 12022.5, subd. (d)) and personally and intentionally discharged a firearm (§ 12022.53, subd. (c)). As to counts 1, 2, 3, and 8, it was alleged that Lopez personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)) and personally used a

3.

firearm (§ 12022.5, subd. (a)).  The information further alleged aggravating sentencing factors.[2]

On October 24, 2023, the jury found Lopez guilty on counts 1, 3, 6, and 8, and it found the corresponding firearm and great bodily injury allegations true.  Lopez was found not guilty on counts 5 and 7.

On November 28, 2023, the court held a trial on the aggravating circumstances. The court found that appellant engaged in violent conduct that indicates a serious danger to society (Cal. Rules of Court, rule 4.421(b)(1)), and he had prior convictions of increasing seriousness (Cal. Rules of Court, rule 4.421(b)(2)).  It found the remaining aggravating circumstances to be not true.

On January 17, 2024, Lopez was sentenced to state prison for an aggregate term of 11 years plus 25 years to life, based on seven years on count 1 plus 25 years to life for the section 12022.53, subdivision (d) enhancement, and four years for the section 12022.7, subdivision (e) enhancement.  The sentences on counts 3, 6, and 8 were stayed pursuant to section 654.

A timely notice of appeal followed.

*The Prosecution's Case*

*A.  The Shooting*

On January 1, 2023, at around 11:00 a.m., Lopez and his fiancée, M.P., attended a family gathering at a residence in Bakersfield.  At the time, M.P. was two or three months pregnant.

A.P., M.P.'s sister, arrived a few hours later.  Everyone but M.P. was consuming alcohol.  Lopez and A.P. drank throughout the day and continued into the night.

That evening, Lopez, M.P., and A.P. gathered near a red truck in the backyard with some of the sisters' cousins, including M.V.  Lopez and A.P. began to argue about

---

[2]     Counts 2 and 4 were dismissed pretrial.  During the prosecution's case in chief, the prosecutor moved to dismiss the personal use of a firearm allegation attached to count 1.

4.

her eyelashes. Lopez was sitting in a chair near the front of the truck and A.P. was standing near the back of the truck when A.P. threw a beer can at Lopez, striking him in the mouth.

M.V., who was standing approximately four or five feet away from Lopez, heard Lopez state, "Nah, bitch. You're going to respect me." Lopez stood up quickly, causing his chair to fly back. M.V. stated that everyone jumped up.

M.V. saw Lopez extend his right arm forward in A.P.'s direction, move his index finger, and then observed a flash of light emit from a firearm in Lopez's hand and heard a pop from the gun. M.P., who had been standing next to Lopez, and had begun walking behind M.V., was shot in the back of her neck. She looked at Lopez and stated, "You shot me." As M.P. fell, M.V. caught her.

Two members of the sisters' family began to physically attack Lopez, causing M.P. to run toward Lopez to shield him. M.V. called for an ambulance. When police arrived, Lopez and M.P. were attempting to flee in M.P.'s father's truck. Lopez was arrested.

*B. Police Investigation*

At approximately 11:30 p.m., Officer Tristan Braughton with the Bakersfield Police Department arrived at the scene to "commotion and yelling." As he approached the residence, A.P. shouted, "He shot my sister," while pointing toward Lopez and M.V.

Investigating officers recovered one spent nine-millimeter shell casing from the area near the red truck. Officer Braughton opined it was consistent with ammunition fired from a semi-automatic firearm.

Police also recovered a black nine-millimeter "ghost gun"—a functioning firearm with no serial number or identifying marks—from inside the truck Lopez was inside when he was arrested. M.P. identified the ghost gun as one she had purchased from a friend for protection from the father of two of her children. She claimed that Lopez never touched the gun.

Officer Braughton located Lopez's Facebook profile under the name "Codiciado Lopez." A video had been posted on December 31, 2022, at 11:58 p.m.—approximately 24 hours before the shooting—depicting Lopez holding a gun sideways in his right hand and firing multiple rounds. Although the firearm in the video did not appear to match the ghost gun recovered at the scene, it seemed capable of firing nine-millimeter ammunition. Lopez had a prior felony conviction and was prohibited from possessing firearms.

DNA analysis of the ghost gun revealed a mixture of at least three different DNA profiles. Lopez's DNA profile was 2.5 quadrillion times more likely to match one of those profiles than a random, unrelated Hispanic individual. However, the ghost gun was determined not to be the firearm used in the shooting.

*C. The Trial*

At trial, A.P. testified that she was intoxicated and did not see who fired the shot. She denied telling responding officers that Lopez was the shooter, or that Lopez had stated, "You know what the fuck I'm about, bitch." A.P. also denied hearing or seeing M.P. fall to the ground.

However, on the night of the shooting, responding officer Amy Droege with the Bakersfield Police Department was wearing a body-worn camera which recorded the officers' interaction with A.P. In the recorded footage, A.P. told officers that Lopez had shot M.P. She reported that Lopez had stated, "You know what the fuck I'm about, bitch" just before hearing a loud pop. A.P. also told police that M.P. fell after the shot, and that M.P. told A.P. it was an accident.

M.P. testified that A.P. and Lopez exchanged words during the party, before things suddenly escalated. Beer cans were thrown and one struck Lopez in the mouth. M.P. told Lopez it was time to leave. She stated that everyone had started yelling and screaming.

As M.P. walked away, she was shot in her neck. She claimed that she never told Lopez, "You shot me."

6.

M.P. stated that no prior incidents of domestic violence had occurred between her and Lopez, and claimed Lopez had never threatened A.P.

*The Defense Case*

Lopez testified that he and M.P. had been in a dating relationship for five years and shared one child together. M.P. was pregnant with their second child at the time of the incident.

The night before the shooting, they attended a gathering with friends where some of the guests were firing guns. Lopez stated he did not bring or own any firearms, including the firearm depicted in the Facebook Live video.

On New Year's Day, Lopez, M.P., and their daughter went to a party at the residence of M.V.'s mother. When they arrived late that morning, other relatives were already there. M.V. arrived later with friends, and A.P. joined them later that afternoon.

During the course of the day, Lopez drank between five and seven 200-millimeter BuzzBalls, he shared an unknown number of the 1.75 liter BuzzBalls, and consumed 12 beers. He became "a little bit drunk."

A.P. also drank beer and Buzzballs and M.V. consumed alcohol and smoked marijuana. At one point during the evening, M.P. took her father's white truck to run errands. She later claimed that she bought the ghost gun during this time.

That evening, A.P. and Lopez got into an argument about her eyelashes. Lopez asserted that A.P. threw a beer bottle at him, hitting him in the mouth. He stated, "You need to respect me and not throw that bottle at my mouth," then threw his beer at the truck and walked away. He told M.P., "Let's get the hell out of here."

Lopez denied threatening A.P. or discharging a gun at her. He stated that as they were leaving, M.P. pushed him from behind, and he heard a pop. He did not see who fired a gun or who had shot M.P.

Although he was intoxicated, Lopez claimed he was coherent, able to walk, and was aware of his surroundings. Although Lopez was walking with a limp at the time of the shooting and used crutches, his crutches were in a van when he arrived at the party.

Lopez stated that M.P. was walking behind him when she was shot. After M.V. yelled "You shot M.P.," he was physically assaulted by members of M.P.'s family.

## DISCUSSION

I. SUFFICIENCY OF THE EVIDENCE SUPPORTING LOPEZ'S CONVICTIONS

Lopez contends there is insufficient evidence to support his convictions. His arguments, however, rest primarily on disputed facts and credibility determinations that were resolved against him. It is well-settled that the weight and credibility of evidence are exclusively within the province of the jury. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124 [" 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' "]; *People v. Mendez* (2010) 188 Cal.App.4th 47, 59 ["As long as substantial evidence supports the jury's finding, the possibility that the jury could reasonably have reached a different conclusion does not justify reversal."].)

Following our independent review of the record, we find substantial evidence supports his convictions.

*A. Applicable Law/Standard of Review*

The standard for assessing a sufficiency-of-the-evidence claim is highly deferential. The appellate court examines the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence; that is, evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (See *People v. Cravens* (2012) 53 Cal.4th 500, 507; see also *People v. Kurey* (2001) 88 Cal.App.4th 840, 848–849 [we

"resolve all inferences and intendments in favor of the judgment," and "all conflicting evidence will be resolved in favor of the decision"].)

In conducting our review, we must presume in support of the judgment the existence of every fact the trial court could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919, superseded by statute on other grounds as stated in *People v. Hin* (2025) 17 Cal.5th 401, 441.) We also accept all logical inferences the trial court could have drawn from circumstantial evidence. (*People v. Flores* (2020) 9 Cal.5th 371, 411.)

The question is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial evidence supports the trier of fact's finding. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 139.) As such, a party challenging the sufficiency of the evidence bears a heavy burden. The judgment must be upheld unless it appears that, under no hypothesis whatsoever, is there sufficient substantial evidence to support it. (*People v. Cravens, supra*, 53 Cal.4th at p. 508; *People v. Sanchez* (2003) 113 Cal.App.4th 325, 329.)

*B. Analysis*

*1. Attempted Murder (Count 1)*

Lopez was convicted of the attempted murder of M.P. To prove Lopez was guilty of this crime, the prosecutor was required to prove "1. The defendant took at least one direct but ineffective step toward killing (another person …; [¶] AND [¶] 2. The defendant intended to kill [that person]." (CALCRIM No. 600.) There was substantial evidence of both elements here.

Following a verbal confrontation, A.P., threw a beer can at Lopez, hitting him in the mouth. Lopez stated, "Nah, bitch. You're going to respect me," and something to the effect of "You know what the fuck I'm about, bitch." M.V. testified that Lopez extended his right arm out in front of his body and then fired a firearm at A.P. This evidence strongly demonstrates that A.P. was the intended target, and that Lopez shot at A.P. with

9.

the intent to kill her.[3] (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690, quoting *People v. Lashley* (1991) 1 Cal.App.4th 938, 945 ["The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill....' "])

Lopez nonetheless contends the evidence was insufficient to support his conviction for attempted murder for several reasons. First, he argues the trial court erroneously failed to instruct the jury with CALCRIM No. 224 and admitted video evidence that lacked proper foundation and authentication. These contentions are misplaced. A substantial evidence challenge asks only whether the record contains evidence that is reasonable, credible, and of solid value to support the verdict. (*People v. Hin, supra,* 17 Cal.5th at p. 451.) It does not provide a vehicle for challenging jury instructions or evidentiary rulings. We address those claims elsewhere in this opinion, under the appropriate standard of review.

Second, Lopez submits it was physically impossible for him to fire a gun because he needed crutches to stand. Lopez himself stated that he had left his crutches in the van while he attended the party. His admission that he had abandoned his crutches before the shooting forecloses the argument that he was physically incapable of firing a weapon.

Third, he argues M.P. was never asked who shot her even though she "kept saying that it wasn't [Lopez] to anyone who would listen." M.P. told police that Lopez did not shoot her, and the jury saw this evidence through body-worn camera footage and transcripts from that video. The jury heard M.P.'s claim and rejected it. That determination is not subject to our review.

---

[3] The record supports the conclusion that Lopez, who was standing on the other side of the same truck as A.P., fired at her from close range.

Fourth, Lopez boldly asserts no one saw him holding or carrying a gun. Lopez acknowledges that M.V. described Lopez firing a gun, "[b]ut she did not say she saw the firearm, … only the flash."

M.V. testified that "one minute [Lopez] doesn't have a gun. The next minute he has a gun." Following an objection by trial counsel, the prosecutor clarified, "The next time …you saw Mr. Lopez with a gun is when you saw a muzzle flash and a loud bang[?]" M.V. responded affirmatively. Although M.V. did not describe the color, size, or type of gun, her testimony indisputably supports the conclusion that M.V. saw Lopez with a gun at the time of the shooting.

Fifth, Lopez directs this court to testimony by M.V. stating that she believed A.P. was going to run up on Lopez, and he "was in danger of getting beat[en] up by A.P." M.V. testified that when A.P. gets mad, she has a hard time controlling her anger. She stated that she was focused on what A.P. was going to do in response to Lopez's comments, stating that she thought A.P. "was going to run up to Mr. Lopez," potentially escalating the argument.

M.V.'s testimony on this point bears little relevance to Lopez's conviction for attempted murder. Lopez did not raise a self-defense claim below, nor does the trial evidence independently support such a claim. Evidence that M.V. was watching A.P. and that she believed A.P. might attack Lopez does not undermine Lopez's conviction for attempted murder.

Sixth, Lopez asserts the jury should have acquitted him of attempted murder because A.P. testified she did not perceive that she was the target of the shooting. He observes that A.P. reported being drunk when she spoke to responding officers following the shooting, and that she denied making statements to police inculpating Lopez as the shooter.

11.

Whether A.P. perceived that she was the target of the shooting does not undermine Lopez's conviction for attempted murder. Her belief was not directly relevant to whether Lopez acted with the intent to kill her.

Moreover, A.P.'s trial testimony was not credible. She denied telling law enforcement that Lopez was the shooter and claimed that she heard nothing on the night of the incident. But the responding officers' body-worn camera video showed otherwise. In the body-worn camera footage, A.P. told responding officers, "He shot my sister," referring to Lopez. A.P.'s subsequent denials were before the jury, which was free to discount them. They do not constitute a basis for reversal.

Seventh, Lopez argues that because he never explicitly threatened to kill A.P., the evidence was insufficient to establish that he acted with the intent to kill. But explicit threats are not an element of the offense of attempted murder, and circumstantial evidence amply supports the inference that Lopez acted with the intent to kill. Immediately before the shooting, Lopez and A.P. were engaged in a heated exchange during which A.P. threw a beer can at Lopez, striking him in the face. Lopez responded, "Nah, bitch. You're going to respect me." The jury could reasonably conclude that Lopez felt disrespected and that his subsequent act of firing a gun at A.P. was a physical expression of his unstated intent.

Finally, Lopez relies upon the fact that the gun used in the shooting was never recovered, and that there was no gunshot residue evidence connecting him to the shooting. But the absence of this physical evidence does not render the remaining evidence insufficient. M.V.'s eyewitness testimony directly established that Lopez fired a gun at A.P. (See *People v. Myles* (2023) 89 Cal.App.5th 711, 739 [eyewitness testimony is direct evidence].) Further, circumstantial evidence, including the heated exchange involving the beer can, and Lopez's response, demonstrated that he acted with the intent to kill. Neither a recovered firearm nor gunshot residue evidence is required

where, as here, the record contains direct eyewitness testimony identifying Lopez as the shooter.

### 2. Inflicting Corporal Injury on a Dating Partner (Count 3)

To find Lopez guilty of inflicting injury on a cohabitant (§ 273.5, subd. (a)), the prosecutor had to prove (1) Lopez willfully inflicted physical injury on someone with whom he had a dating relationship, and (2) the injury he inflicted resulted in a traumatic condition. (CALCRIM No. 840.) " '[W]illfully' simply means an intent to commit the act that results in corporal injury." (*People v. Serrano* (2022) 77 Cal.App.5th 902, 919; *People v. Thurston* (1999) 71 Cal.App.4th 1050, 1055–1056 ["[t]o satisfy the intent element of spousal injury, a prosecutor need only show an intended assaultive act"].)

The prosecutor was not required to prove that Lopez intended to commit violence against a specific victim, such as M.P. (See e.g., *People v. Lee* (1994) 28 Cal.App.4th 1724, 1736 ["a defendant need not intend to commit violence against a specific victim to be guilty of an assault"].) Accordingly, the fact that Lopez fired a gun with the intention to shoot A.P., but inadvertently struck M.P., does not undermine his conviction.

Upon the instant record, there is substantial evidence that Lopez intentionally discharged a firearm at A.P., striking M.P. instead, resulting in traumatic injury.[4] Lopez contends otherwise, raising multiple claims. First, he argues that the jury could not use evidence of the fact that M.P. purchased a gun on the night of the party to infer that Lopez was guilty of domestic violence. While M.P. testified she had purchased a ghost gun on the night of the shooting, the jury was not required to credit her testimony, and find that Lopez neither possessed nor discharged a firearm.

Second, he directs us to the fact that M.P. claimed the shooting was an accident and a lack of evidence that there were prior domestic violence incidents between them.

---

[4] It is undisputed that Lopez and M.P. were in a dating relationship at the time of the incident.

13.

The jury rejected the conclusion that the shooting was an accident in finding that Lopez personally discharged a firearm with the intent to kill. Further, Lopez need only have acted with the intent to commit the assaultive act—here, the shooting. Thus, the fact that he had no documented history of domestic violence against M.P. has no bearing on the sufficiency of the evidence supporting his conviction.

Third, Lopez asserts the prosecutor erroneously implied that any intent Lopez had to kill A.P. could be transferred to M.P. to supply the requisite intent to commit willful domestic violence. However, the doctrine of transferred intent does not apply here because the instant offense was a general intent crime. (*People v. Thurston*, *supra*, 71 Cal.App.4th at p. 1054.) In other words, there was no specific intent to transfer. The record does not support Lopez's assertion that the prosecutor stated otherwise.

Lopez raises additional claims regarding the evidence, including the fact that the eyewitnesses disagreed about where the bullet entered and exited M.P.'s body, that the shell casings recovered from the crime scene were not confirmed to have been expended during the shooting, and finally, that there was no evidence supporting the prosecutor's assertion that the shooter used a semi-automatic handgun, with his right hand, and shot the gun sideways.[5]

We need not and do not address each of Lopez's arguments individually. Lopez's attempt to relitigate the trial evidence and what reasonable inferences may be drawn therefrom does not warrant reversal of his convictions. It is the jury, not the appellate court, that must be persuaded of the appellant's guilt beyond a reasonable doubt. (*People v. Cook* (2021) 59 Cal.App.5th 586, 590.) While we do not credit testimony that is " ' physically impossible or inherently improbable.' " (*People v. Brown* (2014) 59 Cal.4th 86, 106), none of the alleged deficiencies asserted by Lopez meet this standard.

---

[5] To the extent that Lopez challenges the prosecutor's comments in closing argument, we address his claim in part III.B.2, *post*.

(See *People v. Ennis* (2010) 190 Cal.App.4th 721, 728 ["While an appellate court can overturn a judgment when it concludes the evidence supporting it was 'inherently improbable,' such a finding is so rare as to be almost nonexistent. ' "To warrant the rejection of the statements given by a witness who has been believed by [the trier of fact], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions" ' "].)

We conclude that Lopez's claims fail to demonstrate that his conviction on count 3 fails for insufficient evidence.

### 3. *Felon in Possession of a Firearm (Count 6)*

Possession of a firearm by a felon is a general intent crime that requires the prosecutor to prove the defendant knowingly possessed a firearm, despite the defendant's prohibited status. (§ 29800, subd. (a)(1).) An individual " 'has actual possession when the weapon is in [their] immediate possession or control.' " (*People v. Blakely* (2014) 225 Cal.App.4th 1042, 1052.)

The jury was instructed that there was more than one act which could support count 6, and that the jurors must unanimously agree on which act supported their verdict. First, when Lopez possessed a gun during the Facebook Live video. Second, when he used a gun to shoot M.P. Finally, the prosecutor argued that Lopez illegally possessed the gun found inside the truck in which he was arrested.

As discussed, there was substantial evidence that Lopez knowingly possessed a firearm, despite his undisputed status as a convicted felon. A.P. made statements to responding officers identifying Lopez as the shooter, and M.V. testified that she saw Lopez with a firearm. Although A.P. denied making any such statements during her testimony at trial, it was for the jury to decide which statements were credible

### 4. *Assault with a Firearm (Count 8)*

"The elements of assault with a firearm, under section 245, subdivision (a)(2) include (1) an assault, which requires the intent to commit a battery, and (2) the

foreseeable consequence of which is the infliction of great bodily injury upon the subject of the assault." (*People v. Cook* (2001) 91 Cal.App.4th 910, 920.)

Lopez discharged a firearm at A.P. with the intent to kill her. The foreseeable consequence from firing a gun at close range would include great bodily injury or death. None of Lopez's arguments, addressed above, undermine the jury's findings on these elements.

### 5. The Domestic Violence Enhancements (Counts 1 & 3)

Section 12022.7, subdivision (e) provides, "Any person who personally inflicts great bodily injury under circumstances involving domestic violence in the commission or attempted commission of a felony shall, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of three, four, or five years. As used in this subdivision, 'domestic violence' has the meaning provided in subdivision (b) of Section 13700."

Under section 13700, subdivision (b), " 'Domestic violence' means *abuse* committed against an adult … who is a … cohabitant, … or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." As explained in section 13700, subdivision (a), abuse denotes "*intentionally or recklessly* causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Italics added.) Recklessness does not require that the defendant specifically target his or her domestic partner.

There is substantial evidence in the record here supporting the conclusion that Lopez recklessly caused great bodily injury to M.P. M.V. testified that M.P. was standing right behind her when the shooting occurred, and that she (M.V.) was standing only four or five feet away from Lopez when A.P. threw a beer can at him. Under the circumstances, the jury could reasonably infer Lopez knew that M.P. was standing nearby when he fired a gun at A.P.

16.

II.     TRIAL COURT ERRORS

Next, Lopez raises a scattershot array of purported reversible and structural trial court errors, none of which finds its mark.

*A. Instructional Errors*

Lopez advances three separate claims of instructional error by the trial court. First, the court erred by instructing the jury with CALCRIM No. 225 rather than CALCRIM No. 224. Second, the court failed to instruct the jury on a bracketed portion of CALCRIM No. 332, sua sponte. And finally, the court failed to instruct the jury with CALCRIM No. 875, the instruction for assault with a semi-automatic firearm (count 2). The Attorney General contends that Lopez's first two claims are forfeited and meritless, and that his last claim fails to establish reversible error.

We agree with the Attorney General on all points. Although we conclude that Lopez's first two claims are forfeited, we nonetheless reach the merits of his assertions given his alternative claim of ineffective assistance of counsel.

*1. Asserted Errors*

    *a. Instructing the Jury on CALCRIM No. 225 Rather Than CALCRIM No. 224*

Lopez contends the trial court erred by instructing the jury with CALCRIM No. 225 [Circumstantial Evidence: Intent or Mental State] instead of CALCRIM No. 224 [Circumstantial Evidence: Sufficiency of Evidence]. We find neither error nor prejudice assuming error.

" 'CALCRIM Nos. 224 and 225 provide essentially the same information on how the jury should consider circumstantial evidence, but CALCRIM No. 224 is more inclusive. [Citation.]' [Citation.] CALCRIM No. 224 'is the proper instruction to give unless the only element of the offense that rests substantially or entirely on circumstantial evidence is that of specific intent or mental state.' " (*People v. Contreras* (2010) 184 Cal.App.4th 587, 592, accord *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1172.)

17.

The difference between CALCRIM Nos. 224 and 225 is that CALCRIM No. 224 provides the jury must believe a reasonable inference of innocence from circumstantial evidence on all facts, not just intent.

Courts have stated that an instruction on the principles contained in CALCRIM No. 224 " 'must be given sua sponte when the prosecution substantially relies on circumstantial evidence to prove guilt.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 885 [analyzing the comparable instruction CALJIC No. 2.01].)  But our Supreme Court has also indicated CALCRIM No. 224 "should not be given where the evidence relied on is either direct or, if circumstantial, is not equally consistent with a reasonable conclusion of innocence." (*People v. Heishman* (1988) 45 Cal.3d 147, 167 [analyzing the comparable instruction CALJIC No. 2.01], abrogated on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.)

In this case, the Attorney General asserts that the trial court was not required to instruct the jury with CALCRIM No. 224 because the prosecutor only relied upon circumstantial evidence to prove Lopez acted with the intent to kill.  Though we agree, the issue is more readily resolved by explaining why any assumed error is harmless.

The nature of the error asserted requires us to examine whether there is a reasonable probability a properly instructed jury would have returned a verdict more favorable to Lopez had the trial court instructed the jury with CALCRIM No. 224. (*People v. Rogers*, *supra*, 39 Cal.4th at pp. 886–887.)  " ' " ' "[A] 'probability' in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." ' " ' " (*People v. Sandoval* (2015) 62 Cal.4th 394, 422, italics omitted.)  " 'In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result.' "

(*People v. Beltran* (2013) 56 Cal.4th 935, 956, italics omitted.) No such probability exists upon this record.

The direct evidence of Lopez's guilt was overwhelming. M.V. personally observed the shooting and testified as an eyewitness. A.P. also identified Lopez as the shooter to responding officers, despite subsequently claiming she was unable to recall the events preceding the shooting. In light of this evidence, it is not reasonably probable that instructing the jury with CALCRIM No. 224 would have yielded a different outcome at trial. Under the circumstances, any presumed error was harmless.

### b. Partial Instruction on CALCRIM No. 332

Lopez asserts that the trial court erred by failing to give bracketed language in CALCRIM No. 332 in response to the DNA expert's responses to hypothetical questions. We conclude that Lopez's claim is both forfeited and meritless.

At trial, Mandi Van Buren, a DNA technical leader at the Kern Regional Crime Laboratory, testified as an expert about DNA analysis. Van Buren conducted a DNA analysis of swabs taken from a gun recovered from the truck in which Lopez was arrested and compared DNA profiles extracted from the gun to Lopez's DNA profile.

The court instructed the jury with CALCRIM No. 332 as follows:

> "Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate.

> You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

As relevant here, the pattern instruction includes the following optional language, which was omitted from the instructions given to the jury:

> "[An expert witness may be asked a hypothetical question. A *hypothetical question* asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion.]" (CALCRIM No. 332.)

Lopez contends that the following exchange warranted giving the bracketed instruction, sua sponte:

> "[Trial Counsel]: So you mentioned DNA from Item 1 onto Item 2. So in that scenario, you have two separate items, let's say a banana and an apple, and you have Person 1's DNA on the banana and Person 2's on the apple. If the apple and the banana come into contact, now the DNA from Person 1 and Person 2 can be on both the banana and the apple?
>
> "[THE EXPERT]: It could, yes, sir."

However, the full context of counsel's line of questioning demonstrates that trial counsel was asking a question about cross-contamination, rather than posing a hypothetical. In the immediately preceding comments, the expert offered the following comments in response to counsel's request to discuss the concept of cross-contamination in the context of DNA analysis:

> "[TRIAL COUNSEL]: Ms. Van Buren, can you talk about the concept of cross-contamination for the jury? What does that mean, cross-contamination in the context of DNA analysis?
>
> "[THE EXPERT]: So cross-contamination could occur when either two samples come in contact with each other -- so while an analyst is working, then one evidence item touches another evidence item and so now the DNA that was on item one potentially gets on item two. It also can happen out like at a crime scene, depending on how evidence is handled from the agency ….

20.

"It could also be referred to even just as transfer where and individual comes in contact with something -- so Item Number A -- and then, in theory, they're leaving some DNA on Item Number A. If another individual comes in and then touches Item Number A, that first person's DNA maybe got on their hand, and then the second person goes and touches another item, in theory, they could take some of that original DNA and put it onto a new item because the DNA is transferring as individual people are touching that same item."

As the full context of the expert's testimony makes clear, trial counsel was asking the expert to use an illustrative hypothetical to explain a general scientific principle, rather than asking the expert to assume facts mirroring the evidence in this case. We are not persuaded that the bracketed language in CALCRIM No. 332 was warranted under the circumstances.

Nonetheless, we conclude that any presumed error was harmless. The bracketed language in CALCRIM No. 332 merely informs jurors how to evaluate hypothetical opinions based on assumed facts. Nothing in the record suggests that the jury understood the instruction as given in a manner that would have lowered the prosecutor's burden or that without the bracketed language, the jury would necessarily credit the expert's testimony as proof of what had actually occurred. Based on the foregoing, we conclude that the court's failure to give the bracketed portion of CALCRIM No. 332 was harmless.

### c. Failing to Instruct the Jury on CALCRIM No. 875

Although the prosecutor requested the jury be instructed with CALCRIM No. 875 [Assault with a Deadly Weapon], the instruction was erroneously omitted from those given to the jury. Lopez was nonetheless convicted on count 8 for assault with a semi-automatic firearm (§ 245, subd. (a)(2)) against M.P. He submits that the absence of this instruction caused reversible error.

The Attorney General concedes error but argues the error was harmless beyond a reasonable doubt. (See *People v. Flood* (1998) 18 Cal.4th 470, 475 [a trial court's failure

21.

to instruct the jury on all elements of an offense is a constitutional error "subject to harmless error analysis under both the California and United States Constitutions"].) We agree that the instructional error here was harmless beyond a reasonable doubt.

" ' "[T]he omission of one or more elements of a charged offense ... is amenable to review for harmless error under the state and federal Constitutions ...." [Citation.] 'A trial court's failure to instruct the jury on all of the essential elements of the charged offense is reviewed for harmless error according to the standard set out in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).' [Citation.] Under the *Chapman* standard, an error is prejudicial and requires reversal of the conviction unless it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] Accordingly, the error " 'will be deemed harmless *only in unusual circumstances,* such as where each element was undisputed, the defense was not prevented from contesting any [or all] of the omitted elements, *and* overwhelming evidence supports the omitted element.' " ' " (*Serrano, supra*, 77 Cal.App.5th at pp. 913–914, italics added; see also, *People v. Aledamat* (2019) 8 Cal.5th 1, 9 [the *Chapman* "harmless error rule applies in a variety of contexts, such as to error in omitting entirely one or more elements of a charged offense"].)

"The [*Chapman*] test is not whether a hypothetical jury, no matter how reasonable or rational, would render the same verdict in the absence of the error, but whether there is any reasonable possibility that the error might have contributed to the conviction in this case. If such a possibility exists, reversal is required." (*People v. Lewis* (2006) 139 Cal.App.4th 874, 887; *People v. Atkins* (2019) 31 Cal.App.5th 963, 981 ["For this type of error, 'the presumption is that we must reverse, unless we find the error harmless beyond a reasonable doubt.' "].)

When a trial court does not fully instruct a jury on every element of a charged offense, " '[t]he critical inquiry ... is not the *number* of omitted elements but the *nature* of the issues removed from the jury's consideration.' " (*People v. Merritt* (2017) 2 Cal.5th

819, 828.)  Even so, "the more elements that are omitted, the less likely it is that the error is harmless, but so long as the error does not vitiate *all* of the jury's findings, it is amenable to harmless error analysis."  (*Id.* at p. 829.)

To convict Lopez of assault with a semi-automatic firearm (§ 245, subd. (a)(2)), the prosecutor was required to prove: (1) Lopez did an act with a firearm that by its nature would directly and probably result in the application of force to a person, (2) he did that act willfully, (3) when Lopez acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone, and (4) when Lopez acted, he had the present ability to apply force with a firearm to a person.  (CALCRIM No. 875.)

Here, the jury was instructed with CALCRIM Nos. 640 [Deliberations and Completion of Verdict Forms: For Use When Defendant Is Charged With First Degree Murder and Jury Is Given Not Guilty Forms for Each Level of Homicide]; 840 [Inflicting Injury on …[a] Cohabitant, or Fellow Parent Resulting in Traumatic Condition]; 3146 [Personally Used a Firearm]; 3148 [Personally and Intentionally Discharging a Firearm]; and 3149 [Personally and Intentionally Discharging a Firearm Causing Great Bodily Injury].

Under these instructions, and based on its verdict, the jury necessarily determined: Lopez personally used a firearm (CALCRIM No. 3146); he intentionally discharged the firearm (CALCRIM No. 3148); the discharge of the firearm caused great bodily injury to M.P. (CALCRIM No. 3149); and he willfully inflicted corporal injury on M.P. (CALCRIM No. 840).  These findings necessarily resolve the factual issues underlying the crime of assault with a semi-automatic firearm.

We acknowledge that the instructions identified do not address the knowledge element of assault, specifically, element three of CALCRIM No. 875.  This element requires that the defendant was aware of facts that would lead a reasonable person to realize his act would directly and probably result in the application of force to someone.

23.

But this element is distinct from, and necessarily implied by, the jury's finding that Lopez willfully discharged a firearm causing great bodily injury. A defendant who intentionally fires a gun at a person at close range is, by definition, aware of facts that would lead a reasonable person to realize that act would directly and probably result in the application of force. No rational juror could find the former without finding the latter.

Moreover, Lopez did not claim that he shot M.P. accidentally or without awareness of the consequences. Rather, he denied being the shooter at all and denied bringing a gun to the party. Having rejected Lopez's claims, the jury necessarily resolved the knowledge element against him. We therefore conclude that the court's failure to instruct the jury with CALCRIM No. 875 was harmless beyond a reasonable doubt.

### B. Discussion of Lopez's Immigration Status

According to Lopez, the trial court discussed his immigration status in open court in violation of Evidence Code section 351.4. Lopez asserts the court should have held an in-camera hearing concerning his immigration status. Although Lopez's failure to object resulted in forfeiture of the error, we address the merits of his claim in light of his alternative claim of ineffective assistance of counsel. We find the error harmless.

#### 1. Background

In his motion in limine, the prosecutor sought to ask M.P. about Lopez's immigration status. The prosecutor did not request an in-camera hearing on the issue. (See Evid. Code, § 351.4.)

At a pretrial hearing, the prosecutor asserted that one of the reasons M.P. may be lying about Lopez's involvement in the shooting was that she may have feared he would be deported if he were convicted. Lopez, a convicted felon, had been previously deported.

The trial court denied the motion, remarking that there were many reasons M.P. might not identify Lopez as the shooter. Lopez submitted on the court's ruling. He raised no objection to the procedure by which his immigration status was discussed.

24.

## 2. *Applicable Law*

Evidence Code section 351.4 provides, "[i]n a criminal action, evidence of a person's immigration status shall not be disclosed in open court by a party or their attorney unless the judge presiding over the matter first determines that the evidence is admissible in an in camera hearing requested by the party seeking disclosure of the person's immigration status." (Evid. Code, § 351.4, subd. (a).)

The disclosure of a witness's undocumented immigration status poses a well-recognized danger of prejudice. (*Velasquez v. Centrome, Inc.* (2015) 233 Cal.App.4th 1191, 1213.) As such, this evidence is likely to inflame the passions of the jury rather than assist it in resolving the issues before it. (See *People v. Doolin* (2009) 45 Cal.4th 390, 439 ["[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction."].)

## 3. *Analysis*

The hearing on the prosecutor's motion was not held in camera, but it did occur outside the presence of the jury. After the court denied the prosecutor's motion to admit evidence of Lopez's immigration status, the jury never heard evidence that Lopez had previously been deported. Consequently, the prosecutor's motion could not possibly have affected Lopez's conviction.

Lopez nonetheless maintains that the prosecutor's motion and the discussion following that motion were required to have been brought in camera. But he does not explain how the prosecutor's failure to request an in camera hearing pursuant to section 351.4 warrants reversal of his convictions. The argument fails for that reason alone. In any event, the hearing was conducted outside the presence of the jury, which substantially mitigated any risk that the open-court discussion prejudiced Lopez. We

conclude that any error in failing to comply with section 351.4's in camera requirement does not warrant reversal.

Lopez suggests there may be future immigration consequences flowing from the asserted error here. He directs this court to recent changes in federal immigration enforcement. The prejudice inquiry under California's harmless error standard asks whether the claimed error affected the outcome at trial. (Cal. Const., art. VI, § 13 ["No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].) Potential consequences that have yet to materialize, and that are unrelated to the judgment of conviction, do not satisfy that standard.

Whatever the validity of Lopez's concerns about federal immigration enforcement policy, they are entirely collateral to whether the open court discussion of his immigration status, rather than an in-camera hearing, affected the jury's verdict. Lopez identifies no mechanism by which the procedural violation here affected the jury's findings, which is the only prejudice relevant to our inquiry.

Moreover, this court is not the appropriate forum to address federal immigration policies. Lopez's reliance on law review articles, White House memoranda, and news reports about Guantanamo Bay and El Salvador raise no issues of California law within this court's jurisdiction. His constitutional concerns, to the extent they are cognizable at all, would be matters for federal habeas proceedings if and when a concrete deprivation of rights occurs, not grounds for reversal of a California criminal conviction supported by substantial evidence.

*C. Improper Admission of Evidence*

Lopez also challenges the admission of certain trial evidence, including: M.V.'s testimony describing and demonstrating how Lopez fired the gun, Officer Braughton's testimony about various types of firearms, video from body-worn camera and a related transcript, and a Facebook Live video and transcript. We find no error.

*1. Applicable Law/Forfeiture*

Subject to Evidence Code section 352, relevant evidence is admissible. (Evid. Code, § 350.) " 'Relevant evidence' means evidence ... having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.)

Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of the erroneous admission of evidence only if an objection to the evidence or a motion to strike it was "timely made and so stated as to make clear the specific ground of the objection." Accordingly, a defendant's failure " 'to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable," and the defendant forfeits his claim on appeal that the trial court erroneously admitted the evidence. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20–21.)

*2. Analysis*

> *a. M.V.'s Testimony Describing and Demonstrating How Lopez Fired the Gun*

During direct examination, Villaneuva demonstrated how Lopez fired the gun, and mimed how light was emitted from the gun:

"[THE PROSECUTOR]: Did you see the defendant shoot a firearm?

"[M.V.]: Yes.

"[THE PROSECUTOR]: What did you see specifically?

"[M.V.]: Like a light -- a sparking light flash past.

27.

"[THE PROSECUTOR]: Okay.

"[TRIAL COURT]: Hold on. [¶] The witness held out her right hand in front of her body as if a child had a gun in their hand. [¶] Is that correct?

"[M.V.]: Yeah. Yes.

"[TRIAL COURT]: And then you actually -- I saw you actually move what is considered to be your index finger, your trigger finger, when you saw that?

"[M.V.]: Yeah.

"[TRIAL COURT]: Okay.

"[M.V.]: And then the light of the gun was just really fast.

"[TRIAL COURT]: And with that she is -- if at the front of the gun, she moved her left hand and made an outward motion spreading her fingers."

Lopez contends that M.V.'s testimony and her demonstration of the gun emitting light "inflamed the passions of the jury." Trial counsel's failure to object to this testimony below resulted in forfeiture of Lopez's claim on appeal. (*People v. Jasso* (2025) 17 Cal.5th 646, 674, citing *People v. Dykes* (2009) 46 Cal.4th 731, 756 ["[N]umerous decisions by this court have established the general rule that trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal"].)

Lopez submits that trial counsel did in fact preserve his claim for appeal. The portion of the record he directs us to reflects an objection by trial counsel—occurring after the testimony he now challenges—to clarify whether Villaneuva in fact observed Lopez holding a gun. The specific basis for Lopez's objection was "misstates testimony," not that M.V.'s testimony was inflammatory or otherwise improper.

Trial counsel's objection did not encompass M.V.'s subsequent demonstration and description of how Lopez fired the gun and shot M.P., and whether that evidence was relevant and proper. Thus, Lopez's claim concerning M.V.'s challenged testimony is forfeited.

28.

Forfeiture aside, we reject Lopez's assertion that M.V.'s testimony was problematic. M.V. described what she had personally observed, and no more. To that end, there was nothing particularly inflammatory about her description of the shooting such that it might have provoked an emotional reaction in the jury. This evidence was also relevant to a disputed and material issue at trial—whether Lopez was the shooter. Lopez's assertion to the contrary is meritless.

### b. Officer Braughton's Testimony About Firearms

Officer Braughton testified that one spent nine-millimeter shell casing was recovered from the crime scene. When questioned about his familiarity with firearms, Braughton explained that he had previously been in the California National Guard where he handled firearms regularly, and that he had extensive training on firearms as a law enforcement officer, and as a member of a SWAT team. He explained that he was familiar with single-shot handguns, such as revolvers, as well as semi-automatic handguns.

Trial counsel objected on relevance grounds. The prosecutor explained that Braughton's testimony was relevant to the location of the shell casing recovered in the crime scene, and the court overruled counsel's objection.

Braughton further explained that when a revolver is fired, the shell casing remains within the cylinder until physically removed. By contrast, each time a semi-automatic handgun is fired, it ejects the shell casing out of the side of the gun. The recovery of a spent shell casing at the crime scene therefore suggested that a semi-automatic handgun was used. Braughton added that the shells used in a revolver are longer and shaped differently than the casing recovered here.

The prosecutor then asked Braughton whether he was familiar with depictions in movies and rap videos of individuals holding guns sideways. Braughton responded affirmatively and confirmed that the Bakersfield Police Department does not train

officers to hold firearms in that manner. The court overruled trial counsel's relevance objection. Braughton explained that holding a gun sideways reduces accuracy because the sights are located on top of the firearm. He further explained that if a shooter held a semi-automatic pistol sideways with their right hand, the shell casings would likely eject to the left and the bullet would skew to the right. Holding a gun sideways with the left hand would cause the casings to eject straight down.

Lopez contends the trial court erred by overruling trial counsel's objection to this testimony. Lopez asserts, without support in the record, that this evidence inflamed the passions of the jury by drawing parallels to rappers and gang members, and that there was no evidentiary support for concluding that he held the gun sideways, or that he used a semi-automatic handgun.

We are not persuaded. The testimony was not inflammatory, and its relevance was plain. The prosecutor adduced video evidence depicting Lopez holding and firing a gun sideways less than 24 hours prior to the currently charged shooting. Based on the way Lopez held the gun in the video—sideways and with his right hand—the shell would have been ejected to the left, and the bullet would likely have skewed to the right. In closing argument, the prosecutor asserted that the location of the shell casing recovered at the crime scene, combined with the inaccuracy of Lopez's aim, suggested that he had held the gun sideways during the shooting, consistent with the way he had held the gun in the Facebook Live video. We conclude that Braughton's testimony provided the jury with a framework for evaluating the evidence, and the trial court did not err by admitting it.

### c. The Facebook Live Video

Lopez further argues the court erred by permitting the prosecutor to play the Facebook video evidence a second time, during Braughton's testimony. As we understand Lopez's argument, he contends that the Facebook Live video and transcripts

should not have been admitted in the first instance, and the prosecutor compounded any prejudice from the erroneous admission of the video by playing it twice. We reject both claims.

Trial counsel stipulated to the admission of the Facebook video and transcript. His stipulation forfeited Lopez's challenge to its admissibility on appeal. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1328, fn. 7.)

While counsel objected to replaying the video during Officer Braughton's testimony, the court implicitly overruled the objection, despite commenting, "I don't know why we need to play it a second time." The record lacks any affirmative indication that playing the video a second time was prejudicial.

Video evidence of Lopez holding a gun sideways less than 24 hours before the shooting is highly probative evidence. The manner in which he held the gun in the video is identical to how the prosecutor argued Lopez had held the gun when he shot at A.P., based on the location of the shell casing recovered and the inaccuracy of his aim. Moreover, only seven seconds of the video were replayed for the jury. Under the circumstances, there was virtually no risk that replaying the video would cause an undue consumption of time or otherwise violate Evidence Code section 352.

*D. Allowing the Jury to Ask the Witnesses Questions*

According to Lopez, the trial court allowed the jury to ask him questions, "replacing the adversarial process with an inquisitorial process" (some capitalization and italics omitted). However, the jurors were never permitted to directly interrogate the witnesses, and trial counsel never objected to either the procedure utilized by the court or

31.

the questions the court asked that originated from the jury. We find no error, nor prejudice assuming error.[6]

Outside of the presence of the jury, the parties discussed whether the jury should be permitted to ask questions. Trial counsel stated that the process would make him "uncomfortable," but he did not object. The trial court explained that any questions the jurors had would be submitted to the court so that it could determine whether the question should be asked.

When the jury was instructed at the beginning of trial, the court advised the jury that it could ask questions of the witnesses. The court explained the questions would need to be submitted to the court first for screening, and if the court agreed to ask the question, the parties would have an opportunity to object.

The jury submitted questions for Lopez. They asked whether Lopez had engaged in a physical fight with any family members, where the crutches were that Lopez claimed he was using at the time of the incident, and why was he sitting in the driver's seat of a vehicle when police responded to the shooting. Trial counsel did not object.

In *People v. Cook*, a capital case, the jury was permitted to submit written questions for the witnesses to the court. (*People v. Cook* (2006) 39 Cal.4th 566, 592.) The question was shown to counsel for the parties, and after counsel acquiesced, the court asked the witness the question. Both sides were given the opportunity to object. Our Supreme Court found no error, particularly considering the nature of the jury's questions and the fact that the court screened out irrelevant questions. (*Id*. at pp. 592–593.)

The trial court here used a similar procedure as in *People v. Cook, supra*, 39 Cal.4th 566. Rather than permitting the jurors to directly interrogate the witnesses, it

---

[6]    Lopez did not object to the procedure he now challenges on appeal. He attempts to circumvent the need for a timely and specific objection below by claiming that structural error occurred, but he directs this court to nothing to support his claim. Because we find his argument meritless, we do not address the Attorney General's claim of forfeiture.

screened the questions first and provided the parties the opportunity to object. We find no error under the circumstances.

### E. The Court's Failure to Review the Adequacy of the Prosecutor's Case Sua Sponte

Next, Lopez asserts that the trial court should have independently examined the evidence to ascertain whether his case was adequate. We conclude that Lopez has waived this issue by failing to move for a judgment of acquittal. To the extent that we have concluded that substantial evidence supports his convictions, we further conclude that Lopez's claim fails on the merits. (See part I.B., *ante*.)

Section 1118.1 provides the following, in relevant part: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

As the Attorney General correctly observes, the court does not have a sua sponte duty to review the sufficiency of the prosecutor's evidence, and to dismiss the case if inadequate. (*People v. Smith* (1998) 64 Cal.App.4th 1458, 1467 ["we find nothing in the language of sections 1118 or 1118.1 suggesting the trial court has a duty, absent a request, to review the prosecution case at its close to determine its evidentiary sufficiency"].) To that end, "a failure to bring a section 1118.1 motion at the close of the prosecution case waives any claim the evidence was at that point inadequate." (*Id.* at p. 1468.) Lopez's case presents no exception to the rule. As such, his claim of error is forfeited.

### III.    ALLEGED PROSECUTORIAL ERRORS

Lopez attempts to recast his claims as prosecutorial error and additionally asserts the prosecutor vouched for the credibility of facts and one of the witnesses. He

specifically argues the prosecutor committed error by disclosing his immigration status in pretrial pleadings and in open court, admitting potentially false evidence, vouching for "facts" and the credibility of one of the witnesses, and failing to ensure the proper jury instructions were given. We find no reversible error.

### A. Forfeiture

To preserve a claim of prosecutorial misconduct for appellate review, "a defendant must object and request that the jury be admonished concerning the misconduct." (*People v. Peterson* (2020) 10 Cal.5th 409, 464; *People v. Johnsen* (2021) 10 Cal.5th 1116, 1164, quoting *People v. Seumanu, supra,* 61 Cal.4th at p. 1328 ["It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal"].)

" ' "[A]s a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' " (*People v. Huggins* (2006) 38 Cal.4th 175, 251–252.) An exception to this rule provides "[a] defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile." (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

With only two exceptions, the Attorney General contends that Lopez's claims of prosecutorial error are forfeited. Those two exceptions include comments by the prosecutor suggesting that Lopez became enraged when people at the party were laughing at him, and the prosecutor's assertion that Lopez was arrested in a truck with a gun inside.

Lopez, in response, asserts that some of his claims were preserved without a contemporaneous objection. Specifically, he contends that the prosecutor's discussion of his immigration status was improperly admitted evidence not requiring an objection to

preserve, that his witness vouching claims not specifically objected to by trial counsel were preserved by trial counsel's motion in limine, and that his instructional error claims amounted to structural error, foreclosing the need for a timely and specific objection.

Lopez fails to direct this court to any legal authority supporting his assertion that structural error resulted. Structural error, such as the denial of counsel or judicial bias, is rare. (*People v. Anzalone* (2013) 56 Cal.4th 545, 554 ["There is a strong presumption that any error falls within the trial error category, and it will be the rare case where a constitutional violation will be subject to harmless error analysis"].)

Moreover, we are not persuaded that any objections raised in Lopez's motion in limine were sufficient to preserve his claim of prosecutorial vouching on appeal, particularly where he failed to request curative admonitions. (See *People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 29, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841 ["[t]he defendant must generally object 'in a timely fashion—and on the same ground,' and must 'request[] that the jury be admonished to disregard the impropriety' "].)

We nonetheless reach the merits of these claims because Lopez alternatively asserts that trial counsel was ineffective for failing to preserve these issues.

### B. Analysis

#### 1. Discussion of Lopez's Immigration Status

According to Lopez, the prosecutor committed prejudicial error by discussing Lopez's immigration status in his motion in limine and at the hearing on his motion. Lopez reasserts that the prosecutor violated Evidence Code section 351.4.

As stated in part II.B.3, *ante*, we conclude Lopez has failed to demonstrate reversible error by failing to request an in camera hearing to discuss Lopez's immigration status.

#### 2. Vouching for a Witness's Credibility

Lopez asserts the prosecutor committed improper vouching on eight separate occasions during his comments in closing argument. First, by summarizing statements

made by Lopez immediately preceding the shooting. Second, by discussing the shooter's position and the type of gun used in the shooting, representing these were conclusive facts rather than reasonable inferences from the trial evidence. Third, by arguing the gun recovered at the scene was the gun used in the shooting. Fourth, by arguing that Lopez was enraged by the fact that people were laughing at Lopez after A.P. threw a beer can at him. Fifth, by stating that the police arrested Lopez in a truck with a gun, while simultaneously failing to clarify that the gun recovered in the truck was not the gun used in the shooting. Sixth, by stating the Facebook Live video was taken less than 24 hours before the shooting, which Lopez contends is a fact not in evidence. Seventh, when the prosecutor stated, "[W]e don't need to show you the gun to show you the defendant shot at somebody." And finally, by vouching for M.V.'s credibility.

We find his assertions problematic for two reasons. First, the majority of Lopez's assertions do not demonstrate prosecutorial vouching. Prosecutorial vouching occurs when a prosecutor expresses a personal belief in a witness's credibility or implies that information outside the record supports a witness's testimony. (*People v. Stewart* (2004) 33 Cal.4th 425, 499 [" '[a] prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record' "].) Here, in contrast, Lopez challenges the prosecutor's characterization of the trial evidence. But Lopez's claims that the prosecutor improperly characterized the trial evidence are belied by the record.

Second, the majority of Lopez's claims are forfeited for failing to object below and request a curative admonition. (See e.g., *People v. Turner* (2004) 34 Cal.4th 406, 432 [trial counsel's failure to object to claims of improper witness vouching were forfeited, where counsel did not object or seek a curative admonition].) We nonetheless reach the merits of his claims considering his alternative claim of ineffective assistance of counsel. For the reasons discussed below, we find no prejudicial error.

### a. Applicable Law

" '[A] prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citations.] Nor is a prosecutor permitted to place the prestige of her office behind a witness by offering the impression that she has taken steps to assure a witness's truthfulness at trial. [Citation.] *However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' [the prosecutor's] comments cannot be characterized as improper vouching.*' " (*People v. Stewart, supra*, 33 Cal.4th at p. 499, quoting *People v. Frye* (1998) 18 Cal.4th 931, 971, italics in *Stewart*; accord, *People v. Seumanu, supra,* 61 Cal.4th at p. 1330; *People v. Medina* (1995) 11 Cal.4th 694, 757 [explaining that improper witness vouching "usually involves an attempt to bolster a witness by reference to facts outside the record"].)

### i. Summarizing Statements Lopez Made Immediately Preceding the Shooting

Lopez contends the prosecutor engaged in vouching by stating Lopez threatened to physically harm A.P. just prior to the shooting. The relevant portion of the prosecutor's challenged comments, made in closing argument, are as follows:

> "[THE PROSECUTOR]: … right before the shooting, he said some words. He said words to the effect, 'Nah, bitch, you're not going to talk to me that way. You're going to respect me.' That came from [M.V.]. He also said some words to the effect of, 'You know what the fuck I'm about, bitch.' That came from [A.P.] when she told the officers that. [¶] It's pretty clear, while -- this is what we call direct and circumstantial evidence. Did the defendant say, "I'm going to kill you, [A.P.]?' No, he didn't. *Instead, he said words to the effect of, 'You are disrespecting me, and I am going to correct that through my physical actions.'* I think that's the most polite way I can say it without cussing." (Italics added.)

37.

Lopez specifically challenges the prosecutor's summation of Lopez's comments: "Instead, he said words to the effect of, 'You are disrespecting me, and I am going to correct that through my physical actions.' "

Contrary to Lopez's assertion, this was a fair commentary on the evidence. M.V. testified that she heard Lopez state, "Nah, bitch. You're going to respect me." Further, although A.P. was not a cooperative trial witness, she told law enforcement that Lopez had stated something to the effect of, "You know what the fuck I'm about bitch." The prosecutor's interpretation of these statements was a fair opinion based on their meaning.

Lopez also takes issue with the prosecutor's use of profanity when directly quoting the witnesses' testimony. He perfunctorily asserts this language inflamed the passions of the jury. We are not persuaded however that quoting the witnesses directly was, at all, improper or inflammatory. We therefore summarily reject his assertion.

### ii. Discussing the Shooter's Position and the Type of Gun used in the Shooting

According to Lopez, the prosecutor committed improper vouching by arguing facts not in evidence, including by discussing the type of gun used in the shooting, the fact that Lopez held it sideways, using his right hand, and where he was positioned relative to M.P. when the shooting occurred. Lopez contends that none of this was proven, and that the prosecutor could not have known what type of gun was used in the shooting or how it was held. We disagree.

During his comments in closing argument, the prosecutor stated the following:

"[THE PROSECUTOR]: He shoots his weapon 24 hours before the shooting. He uploads to Facebook a video of him shooting weapons in the exact same manner the shooter must have shot in order to injure M.P. [¶] The physical evidence recovered acts as a type of identifier that indicates the defendant as the actual shooter. It identifies the location of the shooter, as well as the defendant's unique shooting style, and it explains why he missed his target. [¶] Ladies and gentleman, science doesn't lie. People do. I'll say that again, Science doesn't lie. People do."

The prosecutor continued, explaining that three people had, at various points, identified Lopez or otherwise made statements indicating that he was the shooter, including A.P., M.P., and M.V. M.V. described where Lopez was standing when he discharged his firearm, and the fact that he was holding the gun in his right hand.

Further, the Facebook Live video uploaded to Lopez's account less than 24 hours prior to the shooting depicted him firing a gun sideways with his right hand. Officer Braughton testified that firing a gun in this manner would have reduced the accuracy of the shooter's aim, causing the bullet to skew to the right. This could explain why M.P. was shot rather than A.P., Lopez's intended target.

Additionally, a nine-millimeter shell casing was recovered from the crime scene. The shape, size, and location of the bullet suggested that the shooter used semi-automatic gun during the shooting, and that the shooter may have held the gun sideways in their right hand.

From this evidence, the jury could reasonably infer that Lopez fired a semi-automatic firearm at A.P., while holding the gun sideways with his right hand. The prosecutor's comments were therefore fair commentary on the evidence and the reasonable inferences therefrom.

### iii. Arguing that the Gun Recovered at the Scene Was the Gun Used in the Shooting

Lopez contends the prosecutor "made a vouch" that a gun was recovered from the scene of the shooting, when in fact, that gun was found in the truck where Lopez was sitting in when he was arrested. Although Lopez's claims did not entail prosecutorial vouching, we find no error from the prosecutor's challenged comments.

The prosecutor stated there were three guns discussed at trial. The first was the gun Lopez discharged in the Facebook Live video. The second was the ghost gun recovered in the truck in which Lopez was arrested. And the last gun was the gun used to shoot M.P. While discussing the DNA evidence, the prosecutor concluded that based on

this evidence, Lopez likely possessed the gun recovered from the truck.  The prosecutor did not represent that this gun was used in the shooting and Lopez's assertion to the contrary is meritless.

> iv.  *Arguing that Lopez Became Enraged by People Laughing at Him*

Lopez further contends the prosecutor engaged in vouching by arguing that he (Lopez) must have gone into a rage after A.P. threw a beer can at him, causing people to laugh at him.  We conclude that when considered in the full context of the prosecutor's argument, the challenged comments were not prejudicial.

During his comments in closing argument, the prosecutor stated the following:

> "[THE PROSECUTOR]:  …  The defendant wanted to be respected.  He wanted to be feared.  What kind of man puts on his Facebook profile an image of him[self] shooting guns?  …  He's trying to produce an image of a tough guy, a guy you shouldn't mess with ….

> "What happened at that party?  He got into a fight.  He got in[to] fight with a lady.  As you saw as she walked in, she's about half his size.…  She's known as aggressive.  This caused him enormous rage.  Again, I don't believe the evidence shows that the defendant was just merely sitting there like [at] a debate and she was getting all angry, and he was doing nothing.  That's not consistent with the facts that we saw.

> "Everybody had been drinking, yes.…  They get into an enormous argument.  Look at that chair.  That chair is bent over.  That's the chair he was sitting on as he … stood up and he said, 'Bitch, you better fucking respect me.'

> "Now, imagine this: You're this type of individual at that type of party where everyone's been drinking, and then she throws a beer bottle — or a beer can at him or something, hits him in the face.  What is the natural response of a bunch of people drinking?  I would imagine it's laughter.  That would be so funny to everybody else at the party just kind of drinking.

> "And, ladies and gentlemen, think about it … from personal experience, being laughed at is one of the worst feelings a human being can face.  Being laughed at when you're trying to project this image of being a tough guy."

Trial counsel objected asserting the prosecutor's comments "misstates testimony. It's not in evidence." The trial court overruled the objection, and the prosecutor continued, opining that Lopez likely became enraged at A.P. after she threw a beer can at him. The prosecutor theorized that Lopez did not like that people were laughing at him.

We agree with Lopez's assertion that there was no testimony that anyone was laughing at him, but we are not persuaded that the prosecutor's theory amounted to witness vouching, much less that the comments caused reversible error.

For one, the jury was instructed that the arguments of counsel are not evidence. We presume that the jury, properly instructed, was capable of following the trial court's instruction and therefore, disregarded the prosecutor's theory since the trial evidence failed to demonstrate that anyone was actually laughing at Lopez. (See *People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8 [" 'We presume that jurors treat the court's instructions as a statement of law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade' "].)

Moreover, the prosecutor's statements about people laughing at Lopez were " 'not sufficiently serious to constitute prejudicial misconduct.' " (*People v. Turner*, *supra*, 34 Cal.4th at p. 422.) Whether or not anyone was laughing at him, there was ample evidence demonstrating that Lopez felt disrespected by A.P. and therefore had motive to shoot her.

> *v. Stating that Police Arrested Lopez with a Gun and Then Stopped Searching for Another Gun*

Lopez further contends the prosecutor engaged in improper vouching by stating: "The people have openly admitted to you that this was an unlucky investigation. The police arrested the defendant in a truck with a gun that matched the caliber of the shell. The police stopped looking for another gun." These comments did not constitute improper witness vouching, nor were they improper.

41.

In closing argument, the prosecutor explained, "The police arrested the defendant in a truck with a gun that matched the caliber of the shell. The police stopped looking for another gun." After an objection by trial counsel was overruled, the prosecutor added, the gun in the truck "was not used to shoot [M.P.]" There was a stipulation to that effect made during trial. Thus, contrary to Lopez's assertion, the jury was made aware of the fact that the gun found in the truck in which Lopez was arrested was conclusively determined to not be the gun used in the shooting.

> ### vi. *Stating the Facebook video was taken less than 24 hours before the shooting.*

Lopez submits there was "[n]o evidence regarding the 'fact' that the Facebook video depicted events that occurred only 24-hours earlier was proffered into evidence."

Lopez went live on Facebook video on December 31, 2022, at 11:58 p.m. The video depicts Lopez loading a gun and firing it multiple times. The shooting occurred on January 1, 2023, at around 11:30 p.m., less than 24 hours after the Facebook video. The prosecutor's statement that the Facebook Live video was uploaded less than 24 hours before the shooting was therefore an accurate characterization of the evidence, not a misstatement.

> ### vii. *Stating it Was Not Necessary to Produce the Gun Used in the Shooting*

The prosecutor informed the jury that "we don't need to show you the gun to show you the defendant shot at somebody." Lopez does not explain how this comment amounted to witness vouching, and we are not persuaded that it did.

The comment was a fair response to the absence of a recovered firearm and was well-founded in the evidence. M.V. testified as an eyewitness to the shooting, and Lopez was depicted on video discharging a firearm less than 24 hours beforehand. Lopez cites no authority for the proposition that the prosecution was required to produce the firearm used in the shooting, and we summarily reject his claim.

*viii.  Vouching for M.V.'s credibility*

Finally, Lopez contends the prosecutor improperly stated that M.V. did not have a reason to lie.  According to Lopez, M.V. was also a suspect, that she had admitted to knowing about guns, and surmises she has probably shot guns before.  He asserts that Lopez's conviction exonerated M.V. and her family members.

The prosecutor's statement that M.V. had no reason to lie did not amount to witness vouching.  A prosecutor " ' "may make 'assurances regarding the apparent honesty or reliability of' a witness 'based on the "facts of [the] record and the inferences reasonably drawn therefrom." ' " ' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 483.)  Contrary to Lopez's assertion, M.V. was an eyewitness to the shooting with no apparent motive to fabricate her version of the events.  The comment was a permissible inference from the record, not a personal guarantee of her credibility, and it did not constitute misconduct.

### 3.  Error in Failing to Prevent Instructional Error

Lopez recasts his claim of instructional error as one of prosecutorial misconduct, alleging the prosecutor erred by failing to ensure that the jury was properly instructed.  This framing is unavailing.

We have already addressed Lopez's claim of instructional error and found no reversible error.  (See part II.A., *ante*.)  We reject Lopez's argument here for the same reasons.

### 4.  Failure to Move the Court to Dismiss the Domestic Violence Enhancements and Count 3

Lopez reasserts his claims that there was insufficient evidence to support his conviction on count 3 for inflicting corporal injury on a dating partner (§ 273.5, subd. (a)) and the domestic violence enhancements (§ 12022.7, subd. (e)).  He contends the prosecutor's failure to move to dismiss these charges constituted prosecutorial misconduct.

We previously addressed and rejected Lopez's claims of reversible instructional error in part I.B.2 & 5, *ante*. The prosecutor's decision not to move to dismiss count 3 or the domestic violence enhancements was a lawful exercise of prosecutorial discretion. Lopez cites no authority establishing that a prosecutor commits misconduct by declining to dismiss charges that are supported by substantial evidence, and we reject the claim.

IV. VIOLATION OF LOPEZ'S CONSTITUTIONAL RIGHTS

According to Lopez, the trial court and the prosecutor also committed a myriad of errors that violated his constitutional rights. He contends his right to the presumption of innocence was violated when the court permitted the prosecutor to refer to some of the witnesses as victims; his right to confront witnesses against him was violated by the court's treatment of A.P. as a hostile witness; the prosecutor's failure to ask M.P. whether she remembered who had shot her, and by admitting certain video evidence and their associated transcripts into evidence; the court violated his right to an adversarial process by allowing the prosecutor to play the Facebook Live video evidence a second time for the jury; his right to a fair trial was violated by the prosecutor's failure "to call logical witnesses or to properly investigate the evidence"; and the prosecutor "caused Hobbesian perversions of the People of California's sovereignty."

The majority of Lopez's claims are restatements of claims we have already rejected concerning trial court and prosecutorial error. Insofar as Lopez refers this court to his earlier arguments, we summarily deny those claims for the reasons previously stated. As to Lopez's new claims of constitutional error, we find those similarly unavailing for the reasons discussed below.

A. *Violation of his Right to the Presumption of Innocence—Reference to the Witnesses as Victims*

In his motion in limine, trial counsel argued the prosecutor should be prohibited from referring to any of the witnesses as victims during voir dire, opening statements, and trial testimony. At the hearing on his motion, trial counsel explained that whether M.P.

and A.P. were victims was a fact which had to be proven at trial. The trial court declined trial counsel's request, permitting the prosecutor to refer to the witnesses as victims during opening and closing argument, commenting, "That's what the case is about."

Not only does Lopez fail to direct us to relevant portions of the record where the prosecutor referred to M.P. and A.P. as victims, he does not explain how the prosecutor's reference to the witnesses as victims rose to the level of a constitutional violation. "It is beyond dispute that broad and conclusory assertions of prejudice are not enough; appellant must develop an argument that specifically substantiates his claim." (*People v. Cardenas* (1997) 53 Cal.App.4th 240, 248.) In light of Lopez's failure to fully develop his argument, we concluded that it is waived. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793 [" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' "].)

### B. Right to Confrontation

#### 1. Declaring A.P. a Hostile Witness

During trial, the court granted the prosecutor's request to treat A.P. as a hostile witness. Lopez asserts that this violated his Sixth Amendment right to confront the witnesses against him. We disagree.

"A criminal defendant has the right, guaranteed by the confrontation clauses of both the federal and state Constitutions, to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) The right of confrontation 'seeks "to ensure that the defendant is able to conduct a 'personal examination and cross-examination of the witness, in which [the defendant] has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is

worthy of belief.' " " (*People v. Herrera* (2010) 49 Cal.4th 613, 620-621; accord, *People v. Wilson* (2021) 11 Cal.5th 259, 289-290.)

Lopez had the opportunity to cross-examine A.P. Accordingly, there was no violation of his Sixth Amendment right to confrontation. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 494 [" ' "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, 'to expose to the jury facts from which jurors…could appropriately draw inferences relating to the reliability of the witness" ' "].)

In any event, the trial court's decision to declare A.P. a hostile witness authorizing the use of leading questions (Evid. Code, § 764), is subject to the deferential abuse-of-discretion standard. (*People v. Spain* (1984) 154 Cal.App.3d 845, 853.) No such abuse appears on this record.

Before A.P. was called as a witness in the prosecution's case-in-chief, the prosecutor represented in his trial brief that her testimony at the preliminary hearing was inconsistent with what she had told responding officers at the scene of the shooting. During direct examination, A.P. claimed that she did not see who shot M.P. and represented that she did not remember telling responding officers who shot M.P. When asked if reviewing her statement to the police would refresh her recollection, A.P. responded that it might but that she was drunk at the time of the shooting. After reviewing the police report, A.P. testified, "I did not see nobody shoot [M.P.] because I was on the opposite side of the truck of where I found her laying on the floor."

This was contrary to what A.P. had told responding officers on the night of the shooting. The prosecutor asked the court for permission to treat A.P. as a hostile witness. The court granted the prosecutor's request over trial counsel's objection.

This case presents a textbook illustration of circumstances supporting the need to treat a witness as hostile. Considering her statement to responding officers, identifying

Lopez as the shooter, the trial court could reasonably infer that A.P. was being deliberately evasive when she testified that she did not see anyone shoot M.P. Under the circumstances we find no abuse of discretion for allowing the prosecutor to ask M.P. five leading questions.

### 2. *Failure to Ask M.P. Who Shot Her*

Lopez contends the prosecutor also violated his right to confrontation by failing to ask M.P. "whether she remembered who shot her or why if for not remembering who did shoot her did she believe [Lopez] did not shoot her." It is unclear how the prosecutor's failure to ask M.P. who shot her denied Lopez the right to confront the witnesses against him. The argument is therefore deemed waived. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." ' [Citation.] 'We are not bound to develop appellants' argument for them."].)

### 3. *The Prosecutor's Admission of Video Evidence and Transcripts*

Lopez reframes his argument concerning the improper admission of Facebook Live Video evidence and transcripts from that video as one of prosecutorial error. (See part II.C.2.c, *ante*.) For the reasons previously stated, we reject his argument and conclude this evidence was properly admitted.

### C. *Right to Adversarial Process*

Lopez directs this court to his prior argument challenging the admissibility of testimony describing the way Lopez held the gun during the shooting. He does not explain how this evidence violated his right to an adversarial process.

As previously stated in part II.C.2.b, *ante*, evidence concerning the way Lopez had likely held the gun during the shooting was relevant, and the prosecutor's description of

47.

how the gun was held—sideways, like in a rap video or movie—did not render this evidence inflammatory or improper under Evidence Code section 352.

### D. Violation of the Right to a Fair Trial Based on the Prosecutor's Failure to "call logical witnesses or to properly investigate the evidence…"

Lopez asserts the deficient way the prosecutor brought this case "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." He directs this court to the instructional errors previously asserted in part II.A.1., *ante*. We deny his claim for the reasons previously stated.

### E. Hobbesian Error

Finally, Lopez contends that the prosecution committed a fundamental constitutional violation by conflating the government with the sovereign people it purports to represent. Drawing on Justice Wilson's 1793 concurrence in *Chisholm v. Georgia* (1793) 2 U.S. 419 and the imagery of Hobbes' *Leviathan*, he argues that the prosecutor's invocation of "the People of California" obscures the fact that the government is merely an agent of the people, not the people themselves. He claims the prosecutor here abused that agency by failing to call key witnesses, maintaining protective orders M.P. did not want, and bolstering its case with unreliable evidence. Meanwhile, Lopez asserts the prosecutor falsely presented these choices as the will of the People. He urges this court to correct that perversion by holding the prosecution to its duty to follow the evidence wherever it leads. We find Lopez's "Hobbesian error" argument unpersuasive.

Preliminarily, we observe that Lopez fails to identify a cognizable legal claim. The observation that government officials are agents of the people does not establish a violation of any constitutional provision, statute, or procedural rule. Our Supreme Court's decision *Chisholm v. Georgia, supra,* 2 U.S. 419 addressed the scope of federal judicial power over suits against states. It has no application to the prosecutorial decisions challenged here.

Further, prosecutorial discretion over witness selection and charging decisions is well established.  (See *People v. Dehle* (2008) 166 Cal.App.4th 1380, 1386–1387 [" '[t]he prosecution of criminal offenses on behalf of the People is the sole responsibility of the public prosecutor …. [¶] [who] ordinarily has sole discretion to determine whom to charge, what charges to file and pursue, and what punishment to seek' "].)  Lopez identifies no authority holding that the failure to call certain witnesses constitutes a constitutional violation absent a showing of suppressed exculpatory evidence under *Brady v. Maryland* (1963) 373 U.S. 83.  No such showing was made here.

To the extent Lopez argues that the prosecution's conduct amounted to misconduct, that claim is addressed separately.  The political philosophy framing adds nothing to it.  We decline to import the vocabulary of 17th century political theory as a standard of appellate review, and we reject this claim.

V.      INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Lopez contends his trial counsel was constitutionally incompetent based on the claims of error discussed above, including, mischaracterizing CALCRIM No. 225 as CALCRIM No. 224 and failing to ensure CALCRIM No. 224 was given to the jury; failing to object when Lopez's immigration status was discussed in open court; declining to ask M.P. whether Lopez shot her and whether she remembered who shot her; declining to object to the admission of Exhibits 13 [the Facebook Live video], 13A [transcript of the Facebook Live video], 14 [body-worn camera video recording officers' interaction with A.P.], and 14A [transcript of Facebook Live video]; stipulating to the admission of the Facebook Live Video evidence without ensuring that it was properly authenticated or challenging its relevance; and failing to move to dismiss the domestic violence enhancements (§ 12022.7, subd. (e)) and count 3, his conviction for inflicting corporal injury on a dating partner.

49.

Lopez's attempt to recast his claims as ineffective assistance of counsel by his appointed attorney are unavailing. To the extent that we have already addressed his asserted claims of instructional error (see Parts II.A & III.B.3, *ante*), the discussion of his immigration status (see part II.B. & III.B.1, *ante*), and the evidence supporting his convictions (see part I.B.2 & 5, *ante*), we summarily reject his claim. Our analysis is fully detailed above, and we do not and need not repeat our analysis. We find the remainder of Lopez's claims meritless.

*A. Strickland*

To prevail on a claim of ineffective assistance of counsel, an appellant is required to make a two-part showing. (See *People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on other grounds by *People v. Delgado* (2017) 2 Cal.5th 544, 559 [the defendant has the burden of proving ineffective assistance of counsel].) First, they must establish that "counsel's representation fell below an objective standard of reasonableness under prevailing professional norms[.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 519–520.) Second, they must show that trial counsel's deficient performance was prejudicial. (*Id.* at p. 520.)

Prejudice must be affirmatively demonstrated. The record must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694 (*Strickland*).) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*)

" 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105, quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 371.) "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Harrington v. Richter, supra,* at p. 104.) Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." (*Id.* at p. 112.)

*B. Analysis*

*1. Instructional Error*

In a slight variation of his earlier claim of instructional error, Lopez contends trial counsel "repeatedly mischaracterized CALCRIM 225 and CALCRIM 224, believing that CALCRIM 224 was included in the jury instructions when it was not, and misdescribing CALCRIM 225 for the jury and counsel for defense failed to move the court to include CALCRIM 224." (Some capitalization and italics omitted.)

In part II.A.1.a, *ante,* we rejected Lopez's challenge to the use of CALCRIM No. 225 rather than CALCRIM No. 224. For the reasons previously stated, we decline Lopez's claim of instructional error pertaining to the use of CALCRIM No. 225. Any improper description trial counsel may have offered on the elements of this instruction do not supersede the instructions given to the jury.

*2. Failing to Ask M.P. Who Shot Her*

With respect to Lopez's assertions that trial counsel erred by failing to ask M.P. whether Lopez shot her, the record does not support Lopez's assertion of error. Although it is unlikely that M.P. would have identified the shooter, how she would have responded to this question is entirely speculative. "An appellant has the burden of establishing, based on the record on appeal and based on facts, not speculation, that counsel rendered ineffective assistance of counsel." (*People v. Perez* (2018) 19 Cal.App.5th 818, 830; *People v. Stephenson* (1974) 10 Cal.3d 652, 661 ["[t]he proof of [counsel's] inadequacy or ineffectiveness must be a demonstrable reality and not a speculative matter"].)

*3. Failing to Challenge the Admissibility of the Facebook Live Video Evidence*

Likewise, the notion that trial counsel would have successfully challenged the admissibility of the Facebook Live video evidence, is also purely speculative. We conclude that Lopez has failed to demonstrate that trial counsel's stipulation to the admissibility of this evidence constituted ineffective assistance of counsel.

51.

## VI.  CLAIM OF JUDICIAL BIAS

Finally, Lopez contends "Everyone involved in this trial succumbed to implicit biases against Hispanic males and immigrants that runs deep in California, including Judge Bush."  In support of his assertion, Lopez directs this court to the discussion of Lopez's immigration status and the court's failure to mitigate the prejudicial effect of this improper discussion; he alleges Judge Rodriguez concluded Lopez was guilty before his trial began; the court improperly allowed the jury to ask the witnesses questions; the court admitted Exhibits No. 13 [the Facebook Live video], 13A [transcript of the Facebook Live video, 14 [body-worn camera video], and 14A [transcript of the body-worn camera video] without foundation; and that the court failed to dismiss the domestic violence enhancements and count 3 based on insufficient evidence.

Lopez's claim of judicial bias is forfeited for failing to lodge a timely objection on that ground.  (*People v. Pearson* (2013) 56 Cal.4th 393, 447 [finding that trial counsel's failure to object to challenged evidentiary rulings on the basis of judicial bias resulted in forfeiture of the claim on appeal].)  In any event, there was no error, much less one suggesting judicial bias, because his underlying claims of error lack merit.

The only claim not previously raised by Lopez pertains to the Honorable Elizabet Rodriguez.  Lopez vaguely asserts:  "*Judge Rodriguez Concluded Appellant Was Guilty Prior to Appellant's Trial, Violating His Right to a Fair Trial Symbolized by the Principle that the Accused is Innocent Until Proven Guilty [¶] Part II(xi)(a, d) are* reasserted here.  This was a structural error that caused a miscarriage of justice, and an objection would have been futile."

Judge Rodriguez did not preside over Lopez's criminal trial.  She made a pretrial ruling declining to modify the restraining order protecting M.P. from Lopez, which M.P. later sought to dissolve.  Although M.P. made an unsuccessful attempt to modify that order, that does not demonstrate judicial bias.  A victim's preference regarding a

protective order does not control whether one issues; such orders serve interests beyond the desire of the victim.

Assuming Lopez's challenge to Judge Rodriguez's pretrial order is cognizable in the instant appeal, which we doubt, it is unclear how her decision declining to modify the protective order could have affected Lopez's criminal conviction. We conclude that Lopez's argument is not sufficiently developed to support his claim of error and is therefore forfeited. (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277 [" '[T]o demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' [Citation.] 'We are not obliged to make other arguments for [appellant] [citation], nor are we obliged to speculate about which issues counsel intend to raise' "].) We therefore conclude that Lopez's claim of judicial bias is forfeited and meritless.

## DISPOSITION

The judgment of conviction is affirmed.


FRANSON, Acting P. J.

WE CONCUR:


SNAUFFER, J.


DE SANTOS, J.

53.